**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ANGELA ELSTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:10-cv-468** |
| | ) | |
| **MICHAEL J. ASTRUE, in his Capacity as** | ) | **Judge Thomas A. Wiseman, Jr.** |
| **COMMISSIONER OF SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Before the Court is Plaintiff Angela Elston's Motion for Judgment on the Pleadings (Doc. No. 9), which the Court construes as a motion for judgment on the administrative record, seeking judicial review of the Commissioner's denial of her claim for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), on the grounds that the ALJ erred in rejecting the opinion of Plaintiff's treating physician and in discounting the credibility of Plaintiff's subjective complaints of disabling pain. She seeks reversal or, in the alternative, remand pursuant to sentence four of 42 U.S.C. § 405(g). In response to the motion, the Defendant Commissioner of Social Security asserts that the agency's decision denying benefits is supported by substantial evidence in the record and should be upheld.

The prior referral of this case to the Magistrate Judge is withdrawn and the Court finds, as explained below, that the Commissioner's decision is supported by substantial evidence in the record. Plaintiff's motion will therefore be denied, the Commissioner's underlying decision affirmed, and this matter dismissed.

**I. BACKGROUND**

**A. Procedural history**

Plaintiff applied for DIB on August 7, 2007 (AR 12, 30–32).[1] The claim was denied initially and upon reconsideration. (AR 54, 60, 63–64.) Upon Plaintiff's request, a hearing was conducted on

---

[1] Page citations are to the Administrative Record (Doc. No. 7), filed manually pursuant to Court Order (Doc. No. 6).

September 17, 2009, by video teleconference, with Administrative Law Judge ("ALJ") Joseph Scruton in Mobile, Alabama while Plaintiff, who was represented by an attorney, was in Nashville. The ALJ issued his decision denying Plaintiff's claim on October 21, 2009. Plaintiff's request for review by the Appeals Council was denied on March 19, 2010, rendering the ALJ's decision the final decision of the Commissioner. Plaintiff filed this action on May 17, 2010, seeking review of that decision pursuant to 42 U.S.C. § 405(g).

        **B.**        **Plaintiff's Age, Education and Work Experience**

Plaintiff was born in 1967 and was forty-two years old at the time of the hearing and has at all relevant times been classified as a "younger individual" for Social Security purposes. 20 C.F.R. § 404.1563(c). Plaintiff completed high school and obtained some vocational training at a travel school in the late 1980s. Her past relevant work includes experience as a mail clerk, hand packager, and sewing machine operator.

        **C.**        **Plaintiff's Medical History**

Plaintiff was injured in 1984 when she jumped out of a second-story window because of a house fire, at about the age of 17, after which she developed back pain. (AR 233, 322.) In June 14, 2004, Plaintiff was referred to an arthritis specialist, Dr. Paul Wheeler, for follow up on a six-month history of knee and hand pain. No physical findings indicated rheumatoid arthritis ("inflammatory disease") at that time, but Dr. Wheeler noted that the distribution of arthralgia, elevated sedimentation rate, and positive ANA" were "suggestive" of inflammatory disease. (AR 214) Plaintiff also had symptoms of median nerve entrapment that were considered to be secondary to use, a sign of subtle inflammatory synovitis, or a combination of both. She was already taking Vioxx and was prescribed a course of prednisone. Plaintiff had carpal tunnel surgery in 2004. (AR 329.)

Testing in September 2004 testing showed cervical degenerative disk disease with "large spurs" at C4-5 and C5-6. (AR 208.) At that time Plaintiff's prescriptions included Vioxx, a "fluid pill" for high blood pressure, iron, prednisone, Mobic, Diovan, Cymbalta, Zyrtec, Lortab (PRN), and Nasonex (PRN). A note from October 2004 mentions Plaintiff's complaints of increased neck pain, and that Plaintiff would "try to get in to see Dr. Stone." (AR 211.)

The first treatment notes from Plaintiff's treating physician, Dr. Gertrude Stone, are from January 2005. At that time, Dr. Stone noted that Plaintiff complained of her knees, back and neck hurting with an onset date of May or June 2004; that Plaintiff was "very tearful," and that she was "not taking Celebrex" because it "[d]idn't help enough," and "Mobix did nothing." (AR 411.)

In May, Plaintiff was complaining of increased pain in the sacral area of her lower back. The doctor recommended exercise and Advil, and noted she might need physical therapy. (AR 409.) She was also given a sample of Cymbalta. Plaintiff continued to see Dr. Stone on a regular basis every several months, from early 2005 through at least August 2008, complaining consistently about constant neck and knee pain, as well as "hurt[ing] all over." (*See, e.g.*, AR 398.) She was tried on Lortab, Mobic, and Valium, but reported repeatedly that medication was of little help. Dr. Stone noted that Plaintiff was obtaining pain-management treatment at a pain clinic and had undergone knee surgery, but Dr. Stone continued to prescribe Cymbalta and Lyrica for treatment of Plaintiff's fibromyalgia. In January 2008, Dr. Stone mentioned that Plaintiff was trying to get disability for her fibromyalgia, which Plaintiff reported to have been diagnosed "3 yrs ago Feb. 7."[2] (AR 391.) Dr. Stone refilled Plaintiff's Cymbalta prescription for fibromyalgia and noted that Plaintiff got morphine sulfate from the pain clinic and would continue to follow up there. (AR 392.)

Upon referral from Dr. Stone, Plaintiff was treated by Dr. N. Garrett Powell (whose area of specialization is not clear from the record) in September 2006 and December 2006 for complaints of worsening lumbar pain. (AR 233.) Dr. Powell noted Plaintiff's history was significant for an incident twenty-two years ago when she jumped out of a second story window due to a house fire and developed back pain at that time. Since then, she had recurrent back pain as well as pain "in her entire body." (AR 233.) He noted that Plaintiff stated she had been diagnosed with fibromyalgia in the past. She also claimed that her low-back pain had become acutely worse approximately two weeks prior to her first appointment with Dr. Powell. An MRI scan showed an "old compression fracture" at T12 with kyphosis at that level, which the doctor believed might have been associated with her jump from the window. (AR

---

[2] The treatment notes included in the administrative record do not indicate when or by whom Plaintiff was first positively diagnosed with fibromyalgia. At some point, her physicians begin stating as an accepted fact that she had been diagnosed with fibromyalgia. None of them questions or disputes that diagnosis, and the ALJ accepted it as established on the basis that Plaintiff's physicians accepted it as a definitive diagnosis.

233.) The MRI also indicated degenerative signal loss at L5-S1 and a moderate disc bulge at that level. (AR 475.) She had loss of range of motion in her neck and back.

She was referred to a pain management clinic for "conservative therapies" and sent for new x-rays. In October 2006, a diagnostic Medial Branch Nerve Block was performed, with injections at L2, L3, L4 and L5. (AR 471.) Plaintiff later said it did not work for her, but the doctor explained that numbness for two to three hours before pain came back was a positive result because the procedure had been diagnostic rather than therapeutic. Also in October, Plaintiff received a series of steroid injections in the left sacroiliac joint.

An MRI of her cervical spine on December 12, 2006 showed diffuse cervical disc degeneration with mild disc space narrowing at C4-5 and C5-6 and reversal of the usual cervical lordosis. The radiologist's impression was spondylosis with reversed cervical lordosis causing muscle spasm, mild central stenosis and ventral cord flattening at C4-5 and C5-6 levels, more pronounced at C4-5; moderate right foraminal narrowing at C4-5 and left foraminal narrowing at C5-6 secondary to uncovertebral joint hypertrophy. (AR 481.)

On a follow-up examination in December 2006, Dr. Powell noted "increased kyphosis" associated with the compression fracture, as well as mild degenerative changes at the thoracolumbar junction. (AR 231.) Plaintiff stated she was still having low-back pain, exacerbated by prolonged sitting. Dr. Powell noted "slow improvement," and directed her to return in six months, and indicated that if the kyphosis worsened, they could "consider surgical therapies to stabilize this." (AR 234.)

Plaintiff began physical therapy for the low back pain in December 2006, which did not seem to help her symptoms significantly. It was noted that her attendance was "inconsistent" due to "personal matters." (AR 295.) In January 2007, she reported "little change" in her symptoms of continuing low back pain, and inability to tolerate sitting more than thirty minutes or standing more than twenty minutes before the pain increased further. (AR 280.) A progress note for January 11, 2007 indicates that Plaintiff's pain at that time was "well controlled with use of Lortab, which reduces her pain to a tolerable level allowing her to be more active without causing any side effects." (AR 455.) However, to prevent her becoming opioid tolerant, she was switched from Lortab to Percocet, with the plan to switch her back to Lortab at the next visit. She was to continue with physical therapy. (AR 455.)

Plaintiff was sent for a neurosurgical consultation with Dr. Vaughan Allen about her neck pain on January 12, 2007. Dr. Allen did not think surgery was indicated but believed epidural steroid injections would be helpful. He noted that Plaintiff had fibromyalgia, that medication and physical therapy had not helped her neck pain, and that an MRI had shown spondylolytic changes with muscle spasm at C4-5 and C5-6. She also reported low back pain that had been helped by epidural injections. He noted she did not describe radicular or myelopathic symptoms, "just simply intense neck pain." (AR 350.) At his recommendation, Plaintiff received epidural steroid injections in her cervical spine on January 16, January 30, and February 22, 2007, and subsequently underwent a course of physical therapy for her neck pain. In June 2007 Plaintiff returned to Dr. Allen status post epidural injections. She reported no lasting improvement from physical therapy or injections. Dr. Allen noted she might be a candidate for Botox injections and referred her to a pain management clinic.

Physical therapy was discontinued in March when Plaintiff underwent knee surgery to shave off a torn meniscus. She started physical therapy again in April or May, this time apparently for her neck pain. Again, therapy resulted in "minimal gains." (AR 239.) In April 2007, she reported that she had been experiencing chronic neck pain for about a year, with pain down her right arm to the elbow, getting progressively worse. She reported that physical therapy on her neck the prior summer (of which there is no proof in the Administrative Record) had not produced lasting relief. She rated her pain at a level of 8 out of 10 at that time and described it as a continual ache. (AR 240.) She also indicated that the pain was worse at night and made sleeping difficult. She also reported she was limited in "most household activities due to pain." (AR 240.) She was noted to have trigger-point tenderness in the upper trapezius, as well as paraspinal tenderness and suboccipital tension, and tenderness at right subclavius and pectoralis minor with moderate trigger-point tenderness. (AR 267.) Plaintiff discontinued physical therapy after about a month with minimal gains. (AR 246.)

Also in April 2007, Plaintiff reported that Opana was not effective for pain; she was tried on ibuprofen and Zanaflex. The doctor noted: "We have tried multiple pain medications in the past and they have not been effective." (AR 450.)

She underwent another course of steroid injections in the sacroiliac joint in May 2007. (AR 446.)

Plaintiff was examined at the pain-management clinic in July 2007 by Dr. Benjamin Johnson, Jr. At that time, Plaintiff represented that she had had cervical pain continuously for several years, present all the time, located in the posterior neck region and radiating to the back of her head. She described the pain as "aching, throbbing and unbearable." (AR 329.) She reported temporarily improved symptoms with heat and massage, as well as pain medications, physical therapy and epidural steroid injections. Physiotherapy produced no lasting benefits, however, and prolonged sitting made the pain worse. She reported her current medications as including Nexium, Cymbalta, Zyrtec, Lyrica, Diovan, Maxzide, and Ambien CR. Dr. Johnson noted that physical examination revealed dystonia of the trapezius, splenius and rhomboid muscles bilaterally and that palpation of these areas seemed to trigger headaches. No myofascial trigger points were elicited, and the exam was "grossly normal" in other respects. (AR 330.)

In August 2007, Plaintiff reported her pain level as 10 out of 10 without medications, 7 out of 10 with medications, and she described the pain as sharp, constant, and achy, and worse with prolonged sitting. A cane was recommended for help walking, in light of her knee pain. The Plaintiff declined at that time but stated she might consider a cane in the future. (HR 441.) In September, she reported that medication was not helping her constant low back pain. (AR 439.) She did indicate at another exam later the same month that Lyrica, Cymbalta, and MSIR (morphine) helped bring the pain down to a level 5 out of 10. (AR 437.) She was noted to have right hip bursitis on top of everything else.

On November 11, 2007, Plaintiff underwent a "chemodenervation" of the cervical spinal muscles and myofascial trigger points, as a trial. The consent form for this procedure noted she had diagnoses of cervical and truncal dystonia, cervical degenerative disc disease, and retrocollis.[3] This procedure involved the injection of Botulinum Toxin Type A ("Botox") for the purpose of relaxing chronically spasmodic muscles and thereby reducing the pain associated with the muscle spasms.

Later in November, Plaintiff noted she felt "very sedated" as a result of the decision made on her prior visit to increase the dosage of her medications, specifically for Lyrica and MS Contin. The dosages were reduced somewhat, and she was tried on Oramorph instead of MS Contin. (AR 435–36.) She later reported being unable to afford Oramorph so was switched back to MS Contin.

---

[3] "Retrocollis" is defined as "spasmodic torticollis in which the head is drawn back." Dorland's Medical Dictionary for Health Consumers (2007).

Her complaints were basically the same on visits through early summer (June) of 2008. In a visit in December 2008, she reported that she had had problems with insurance so had not been able to return in the intervening period. She continued to report severe pain in her back and right knee, and that Lyrica helped her fibromyalgia symptoms but not the back and knee pain, which made it difficult to function. On physical examination, she exhibited marked tenderness in the sacroiliac region and right trochanteric bursa and right knee. She was sent for steroid injections in her knee. Her Lyrica prescription was refilled and she was tried on Ultram. She reported on her next visit, in January 2009, that Ultram had not worked, and that her back pain continued and was "worse with sitting." She was prescribed Lortab and ibuprofen and a new MRI scan. (AR 431.)

The MRI scans of her back and knee performed in February 2009 were not markedly different from those performed in 2006. (AR 476, 477.) She reported that her back pain was somewhat better with Lortab, but it did not help her knee pain. Her doctor noted that her back condition was stable "at this time" but if got worse he would "bring her in for lumbar epidural steroid injection since her pain is more discogenic than facetogenic." (AR 497.) She received another series of injections in her sacroiliac joint in April, and underwent a diagnostic nerve block in the cervical spine in May. This was considered successful as it reduced her pain for approximately eight hours.

In June, she noted her fibromyalgia had flared up and was bothering her. She was given a starter pack trial of Savella for fibromyalgia. (AR 486.) She later reported the Savella had not helped as much as Lyrica.

Also in June, Plaintiff underwent "Radio frequency lesioning of facet joint nerves" to treat cervical spondylosis with facet arthropathy, at the left C4, C5 and C6 Medial Branch Nerves (for "joint denervation"). On follow-up in July, she reported her symptoms had somewhat improved overall. (AR 529.) A month later, she underwent radio frequency lesioning of her lower back, at L2, L3, L4 Medial Branch Nerves and dorsal ramus of left L5 nerve root. In August, she indicated this procedure had helped, but she was still experiencing neck pain and muscle spasms. Her "definitive" diagnoses on that visit included "myalgia and myositis, unspecified," as well as cervical spondylosis and lumbosacral spondylosis, and muscle spasm." She was still taking Lyrica and Lortab, as well as Skelaxin. (AR 526.)

While she was undergoing treatment for these physical problems, Plaintiff also received treatment for severe depression and anxiety. She met with her counselor at Volunteer Behavioral Health Care on a basically monthly basis from September 2007 through at least August 2009. The treatment notes for that timeframe reflect that Plaintiff consistently and repeatedly complained of constant severe pain, severe depression manifested by daily crying, agoraphobia, anxiety, and insomnia, largely related to her frustration with her physical condition. Her hair fell out from stress, grew back in, and fell out again. Besides her physical problems, she was also experiencing personal problems that ultimately culminated in divorce from her husband.

### D.      Functional Capacity Evaluations

#### 1.      October 24, 2007 Physical Residual Functional Capacity Assessment

A reviewing physician, Dr. Sam Dillard, completed a Physical Residual Functional Capacity ("RFC") Assessment on October 24, 2007, with projected results as of January 31, 2008, or twelve months after onset. (AR 313–20.) Dr. Dillard noted a primary diagnosis of degenerative disc disease ("DDD"), a secondary diagnosis of degenerative joint disease ("DJD"), and other alleged impairments including hypertension ("HTN"), fibromyalgia, obesity, and gastrointestinal reflux disease ("GERD"). Based on his examination of the available medical records, Dr. Dillard assessed Plaintiff as potentially capable of lifting twenty pounds occasionally and ten pounds frequently, sitting about six hours per eight-hour workday, and standing and/or walking about six hours per workday. He considered that she would be capable of unlimited pushing and pulling, but had postural limitations including being able to climb a ladder or scaffolds only "occasionally" but otherwise could climb, balance, stoop, kneel, crouch and crawl "frequently." (AR 315.) Reaching overhead was limited, but handling, fingering and feeling were unlimited.

In support of his assessment, Dr. Dillard indicated that although Plaintiff's alleged onset date was September 2004, she had worked through February 2005, and that there was "insufficient medical evidence to assess [her] claim" up until January 2007. (AR 320.) He noted that as of January 12, 2007, an MRI of the cervical spine revealed spondylitic changes with muscle spasms at C4-5 and C5-6, with loss of range of motion of the neck and lower spine. She was treated with cervical epidural injections. Her weight at the time was 250 pounds. She continued to complain of cervical pain and lower back pain

in the summer of 2007 and was diagnosed with cervical spine dystonia and chronic headaches. Her medical records also indicated she complained of knee pain in February 2007 and, after an MRI showed a torn meniscus and arthritic changes, underwent a partial menisectomy and chondroplasty of the patella of her right knee. Based on these records, Dr. Dillard found Plaintiff's pain allegations to be "partially credible" based on clear objective evidence of degenerative disc and joint disease, but found no medical evidence to support the fibromyalgia diagnosis. He noted that Plaintiff's obesity was a "factor" but not expected to significantly limit her functionally, and that her hypertension and GERD were non-severe and controlled by medication. While her degenerative disc and joint disease resulted in severe impairments, Dr. Dillard expected Plaintiff's condition to improve over time with therapy. (AR 320.)

### 2. *May 27, 2008 RFC Evaluation*

A Physical Residual Functional Capacity Assessment performed on May 27, 2008 by Dr. Joe G. Allison (AR 376–83) is basically identical to that completed on Dr. Dillard on October 24, 2007, except that his evaluation was to assess Plaintiff's "current condition" rather than projecting her condition into the future, and Dr. Allison's RFC incorporated reference to medical records from November 2007 through February 2008. He noted that Plaintiff's condition had not worsened and she presented no new symptoms. (AR 383.) Like Dr. Dillard, Dr. Allison assessed Plaintiff as capable of lifting twenty pounds occasionally, ten pounds frequently, of sitting for six hours and standing or walking for six hours in an eight-hour workday.

### 3. *Dr. Stone's August 20, 2008 Physical Capacity Evaluation*

Dr. Stone completed a Physical Capacity Evaluation form for Plaintiff on August 20, 2008. (AR 384.) On this form she assessed Plaintiff as able to sit for three hours in an eight-hour work day; to stand and walk for one hour each; to lift or carry up to twenty pounds occasionally but never to lift or carry more than twenty pounds; to occasionally use her hands for simple grasping, pushing, pulling and reaching and to frequently use her hands for fine manipulation; to use her left but not her right foot to operate foot controls; to occasionally bend, climb and reach above shoulder level; and never to never squat, crawl, or stoop. She also assessed a total restriction from working around unprotected heights and driving equipment, and moderate restriction in activities involving being around moving machinery and exposure to dust and fumes. (AR 384.) Dr. Stone commented that Plaintiff was "restricted due to fibromyalgia,"

that she had no cartilage in her right knee and needed a knee replacement, and that she suffered from lumbar and cervical degenerative disc disease. She assessed Plaintiff as unable to work a five-day work week, and stated she would need to take a break every hour during an eight-hour work day, and would be required to lie down or prop her feet up for thirty minutes at a time twice a day. (AR 384.)

### 4. October 29, 2007 Mental Status Examination

Jeffrey W. Viers, M.A., conducted a mental status examination on October 29, 2007. He noted that Plaintiff's diagnoses included fibromyalgia, depression, degenerative disc disease in the neck, obesity, high blood pressure and knee problems. The source of his information included a clinical interview, mental status examination, and a questionnaire concerning activities of daily living completed by Plaintiff. Mr. Viers noted that Plaintiff reported that she stopped working in February 2005 when she ran out of medical leave time, and that she thought at the time that she had lupus. Plaintiff described her mood as "really down"; she felt she was a burden to her husband and failing as a wife and mother. (AR 322.) She had been referred by her primary care physician to a psychiatrist. Viers noted that Plaintiff's mood was dysphoric but calm, and her reports were consistent with her presentation and reliable. Plaintiff did not appear to have any difficulties understanding, communicating, concentrating or remembering due to mental conditions. She reported moderate to marked impairment in social interaction due to depressive symptoms, but appeared to have only mild to moderate impairment in social interaction on the day of the examination. Viers believed Plaintiff would have no difficulty taking precautions in the workplace and only mild difficulty tolerating stress in the workplace. (AR 325.)

### 5. December 3, 2007 Psychiatric Review Technique

A Psychiatric Review Technique form was completed on December 3, 2007 by Janice L Castles, Ed.D., ABPP. According to Dr. Castles, Plaintiff's affective disorder, specifically "adjustment disorder with depressed mood" (AR 364), was "not severe" (AR 361), and caused no restrictions in Plaintiff's performance of activities of daily living, and only mild restrictions in her ability to maintain social functioning and concentration, persistence or pace. (AR 371.) In the narrative portion of the form documenting the basis for the assessment, Castles noted that Plaintiff was suffering from a "non-severe Depression that is associated with her multiple alleged Physical Disorders." (AR 373.)

A Dr. Warren later "affirmed the original determination as of 10/15/2007" based on no new mental impairment and no treatment for mental impairment subsequent to the prior determination.  (AR 375.)

E.     **Plaintiff's Testimony at the ALJ Hearing**

At the ALJ hearing conducted on September 17, 2009, by video teleconference, Plaintiff testified that she has "pain just about all over [her] body most of the time," and that, even when her fibromyalgia is not in a "flare-up," she has pain in her neck, back and right knee.  (AR 34.)  The pain is such that it has "taken over [her] life," cost her her marriage, and resulted in her being virtually homeless but for staying with other people.  (*Id.*)  Her house was foreclosed on, and she and her twelve-year-old son were staying in an apartment with her best friend's daughter at the time of the hearing.

Plaintiff described her most recent job as a mail clerk as requiring substantial lifting of heavy boxes and a lot of walking on concrete.  Prior to that she did "library processing," which meant she stood at a counter for eight to ten hours.  (AR 36.)

Plaintiff testified that a typical day for her starts with making sure her son gets up and goes to school, which sometimes means she yells at him from her own bed until he gets up.  Otherwise she does not have many activities.  She spends time reading and watching television.  If she goes to Wal-Mart for grocery shopping, she sits in a little electric cart because she cannot walk all over Wal-Mart.  Besides grocery shopping on occasion, her outings mostly consist of going to the doctor or to the physical therapist.  Sometimes, her friend's daughter does grocery shopping for her.  Some days she does not feel well enough to read, so she takes pain medication and sleeps.  Other days she will get up and put clothes in the washing machine or perhaps cook if it is something she can do quickly, but she takes breaks even then.  Weeks go by without her going outside because she is "hurting so bad."  (AR 37.)

Pain medication helps but she still experiences "flare-ups."  Physical therapy and injections have not helped her back, neck or knee very much.  Side effects from the medications include dizziness, sleepiness, and constipation.  She is able to drive, but not if she has taken Lortab recently.

On average, she has two or three "good" days per week, though she is never without pain.  On bad days, which she indicated occur two to three days a week, she can hardly get out of bed except to go to the bathroom.  Sitting in a chair for too long causes her back to hurt.  Standing too long hurts her back and knees.  She estimated she could sit in one position for approximately twenty minutes before she

would need to change positions. She estimated she could stand for no longer than ten minutes at a time. She can walk fifteen to twenty steps at a time while using her cane. She testified that she is not able to kneel, bend or stoop at all. She estimated she could lift five to ten pounds without exacerbating her pain.

About her depression, Plaintiff testified that she has seen a psychiatrist off and on, and her symptoms have remained "[a]bout the same" over time. (AR 42.)

### F.    Vocational Testimony at the Hearing

Vocational Expert ("VE") Leslie A. Gillespie also testified at the hearing. She characterized Plaintiff's past work as a mail clerk as unskilled, at the light level, with an SVP (specific vocational preparation) ranking of 2. Plaintiff's work as a hand packager and library processor was also unskilled work with an SVP of 2, but at the medium demand level. Her work as a sewing machine operator would be semiskilled work with an SVP of 3, also at the light level.

Asked to consider a hypothetical situation involving a claimant of Plaintiff's same age, educational background and work background, and the limitations set out in Exhibit 15-F, the Physical Capacity Evaluation completed by Plaintiff's treating physician, Dr. Gertrude Stone, the VE indicated that she would not be able to identify any occupations that could accommodate those impairments, as Dr. Stone had assessed Plaintiff as capable of sitting for a total of only three hours in an eight-hour workday, and standing and walking for one hour each, for a total of less than eight hours, and had determined Plaintiff had significant limitations in grasping and reaching along with other postural and manipulative limitations.

Asked to make the same assumptions but to modify Dr. Stone's assessment to assume a person who could sit for six hours, with grasping and reaching limited to "frequently" instead of only "occasionally," the VE testified that there would be occupations at the sedentary unskilled level that would accommodate those restrictions. These jobs included envelope addresser, DOT code 209.587-010, a sedentary, unskilled work with an SVP of 2, and of which there are approximately 139,000 jobs nationally and 13,000 in the state of Tennessee. A second possible occupation that would meet the referenced limitations is that of charge account clerk, DOT code 205.367-014, sedentary unskilled work with an SVP of 2, of which there are approximately 227,000 jobs nationally and 6,000 in the state. A third occupation identified by the VE was that of telephone quotation clerk, DOT code, 237.367-046, a sedentary unskilled job with an SVP of 2, of which there are approximately 1.1 million jobs nationally and 18,000 in the state.

(AR 48.)

The ALJ asked the VE to assume the same limitations as previously but with added limitations from pain and depression and side effects from medications, as a result of which the individual was able to understand, remember and carry out no more than short, simple instructions and some detailed instructions. The VE indicated these additional limitations would not affect the claimant's ability to perform the jobs she had identified, as they were all at the unskilled level.

Under questioning by Plaintiff's attorney about a person who required a break every hour, the VE opined that it was "likely that [such a person] would not be able to maintain employment on any type of consistent or ongoing basis." (AR 48.)

## II.      THE ALJ'S DECISION

In his decision dated October 21, 2009 the ALJ made the following specific findings:

1.      The claimant [met] the insured status requirements of the Social Security Act through March 31, 2010.

2.      The claimant has not engaged in substantial gainful activity since September 1, 2004, the alleged onset date (20 CFR 404.1571 *et seq.*).

. . . .

3.      The claimant has the following severe impairments: degenerative disc disease, fibromyalgia, hypertension, degenerative joint disease in bilateral knees, obesity, and affective depressive disorder (20 CFR 404.1520(c)).

. . . .

4.      The claimant does not have an impairment or combination of impairments that meets or medical equals one of the listed impairments. . . .

. . . .

5.      [The claimant has the residual functional capacity to perform less than a full range of sedentary work as defined in 20 CFR 404.1567(b). She can lift up to twenty pounds occasionally, sit for six hours in an eight hour workday and stand and/or walk for two hours in an eight hour work day. She is limited to occasionally bending, squatting, crawling, climbing, stooping, and reaching above shoulder level. She is able to use her hands frequently for grasping, pushing and pulling, fine manipulations, and reaching. She cannot use her right foot for operating foot controls. She cannot work around unprotected heights or driving equipment. She has moderate restrictions in activities involving being around moving machinery and hazards and exposure to dust and fumes. Finally, the claimant can understand, remember, and carry out short simple instructions and some detailed instructions.

. . . .

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

. . . .

7.      The claimant was born on April 1, 1967 and was 37 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

. . . .

11.     The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2004 through the date of this decision (20 CFR 404.1520(g)).

(AR 14–22.)

## III.     APPLICABLE LEGAL STANDARDS

### A.     Standard of Review

This Court must affirm the Commissioner's conclusions absent a determination that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *see also Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).  Even if this Court were inclined to reach a contrary conclusion of fact, the Commissioner's decision must be affirmed so long as it is supported by substantial evidence.  *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted).  Accordingly, a district court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### B.     The Social Security Act and Disability

The central issue on appeal is whether substantial evidence supports the ALJ's determination that Plaintiff was not disabled during the relevant time period.  To be entitled to DIB, a claimant must be insured for disability at the time she becomes "disabled" within the meaning of Title II of the Social

Security Act.  42 U.S.C. § 423.  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* § 423(d)(1)(A).  The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . .

*Id.* § 423(d)(2)(A).

In making a determination as to disability under the above definition, an ALJ is required to follow a five-step sequential evaluation set out in the Social Security Administration's regulations.  20 C.F.R. § 404.1520.  In *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997), the Sixth Circuit summarized the five-step analysis as follows:

> 1.  If claimant is doing substantial gainful activity, he is not disabled.
>
> 2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3.  If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5.  Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Id.* at 529 (citing 20 C.F.R. § 404.1520).  The claimant has the burden of proving the first four steps. *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 147–48 (6th Cir. 1990).  At step five, however, the burden of proof shifts to the Commissioner.  *Id.* at 148.

## IV.    LEGAL ANALYSIS

Plaintiff claims that the ALJ committed reversible error in rejecting the opinion of treating physician Dr. Stone regarding Plaintiff's residual functional capacity, and that he based his decision to reject Dr. Stone's opinion based on an "erroneous analysis of the record."  (Doc. No. 9, at 1.)  Plaintiff also complains, somewhat inartfully, that the ALJ erroneously discounted Plaintiff's credibility with respect

to the severity of her pain.  The Court considers the second argument first.

### A.  The ALJ's Assessment of Plaintiff's Credibility

In assessing whether Plaintiff was disabled by the pain resulting from her musculoskeletal impairments and fibromyalgia, the ALJ noted that "'[i]n order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.'"  (AR 19–20 (quoting *Wilson v. Barnhard*, 284 F.3d 1219, 1225 (11th Cir. 2002).[4])  In going through those steps, the ALJ concluded that there was evidence of underlying medical conditions that could cause pain, including degenerative disc disease, degenerative joint disease of the knees, and fibromyalgia.  He further found, however, that "the objective medical evidence does not confirm the severity of the pain and several factors weigh against the claimant's allegations of pain."  (AR 20.)  With regard to that prong of the test, he went on to assess Plaintiff's credibility regarding the degree of pain she suffered and found it lacking, noting specifically that, although Plaintiff alleged an onset date of 2004, there was no evidence in the record of specialized treatment of her complaints until September 2006, and he characterized the treatment she had received since 2006 as including only "routine and conservative" therapies such as medication, injections, and physical therapy.  (AR 20.)  He further noted that Plaintiff had not been referred for surgery; she had not been to the emergency room or hospitalized for pain, and she acknowledged occasionally that the conservative treatment she received relieved some of the pain.  Finally, he found that the "wide range of daily activities" she acknowledged performing, including "preparing meals, cleaning, caring for her son, shopping, and driving," was "inconsistent with the claimant's statements concerning the severity and limiting effects of her impairments."  (AR 20.)

Plaintiff takes issue with the ALJ's discounting of her credibility on the basis of the stated reasons: (1) that Plaintiff's activity level was inconsistent with the alleged severity of her pain; (2) that she had received only conservative treatment for her pain; and (3) that the conservative treatment appeared to alleviate her pain.  The Court agrees that the record does not support the first of these conclusions, but that overall, the record supports the ALJ's determination that Plaintiff was not suffering from a disabling

---

[4] The Sixth Circuit employs basically the same test, as articulated in *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 853 (6th Cir. 1986).

level of pain.

      With respect to the Plaintiff's daily activities, the ALJ mischaracterized Plaintiff's testimony and the available information in the treatment record.  Plaintiff herself testified that she prepared meals rarely and then only something quick, and she had to take breaks while doing so; she indicated that when shopping she sits in a cart because she is not able to walk around Wal-Mart, that she does not drive if she has taken Lortab or for any great distance; and that she rarely leaves the house except for going to doctor's appointments, physical therapy appointments, and occasional trips to the grocery store.  Her testimony regarding "cleaning" was that she occasionally put some clothes in the laundry if she felt up to it.  (AR 37–40.)  This level of activity is not necessarily inconsistent with Plaintiff's testimony that she experienced a disabling level of pain.  *Cf. Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248–49 (6th Cir. 2007) (finding the ALJ had mischaracterized the plaintiff's testimony regarding the scope of her daily activities and that the fact that she drove a little, engaged in light housekeeping, took care of a dog, read and prepared simple meals was not inconsistent with her complaints of disabling pain due to fibromyalgia, and that these "somewhat minimal daily activities [were] not comparable to typical work activities").  *See also Carradine v. Barnhart*, 360 F.3d 751, 755–56 (7th Cir. 2004) (the ALJ "failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week").  In addition, the ALJ's summary of the evidence ignores Plaintiff's testimony that she spent most days reading or watching television, except for the days that the pain was too bad even for that, in which case she would take pain medication and sleep. She also indicated that she generally had two to three such bad days per week.

      However, while much of the written medical record tends to corroborate Plaintiff's testimony, the treatment notes also indicate with some regularity that Plaintiff's fibromyalgia pain was relatively well controlled with medication, and she mentioned "flare-ups" only on rare occasions.  The record contains frequent notations that she was in "no acute distress," and indications that the pain medication and various other treatment modalities produced some relief.  As the ALJ noted, Plaintiff was never hospitalized for pain, nor was she ever referred for surgery to treat her back pain.

      As previously indicated, the standard for reviewing the Commissioner's decision is deferential.  In fact, it "presupposes that there is a 'zone of choice' within which decision makers can go either way,

without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc). Generally, the reviewing court must affirm the Commissioner's findings if they are supported by substantial evidence and the Commissioner employed the proper legal standard, 42 U.S.C. § 405(g); *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994), even when there is substantial evidence also supporting the opposite conclusion and if the Court itself would be inclined to reach that the opposite conclusion based on the facts in the record. "Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (internal quotation marks and citations omitted). *See also Kent v. Schweiker*, 710 F.2d 110, 114 (3rd Cir.1983) ("Nor is evidence substantial if it is overwhelmed by other evidence. . . .").

In light of the applicable standard and upon review of the entire administrative record as a whole, the Court finds that the ALJ's reasons for discounting Plaintiff's subjective complaints of pain are, just barely, supported by substantial evidence in the record.

**B.** **The ALJ's Treatment of Dr. Stone's Opinion**

Dr. Stone, Plaintiff's primary care physician, filled out a one-page form in August 2008 in which she indicated that Plaintiff's ability to perform work-related activities was severely limited. On this form, Dr. Stone circled the appropriate numbers to indicate how many hours per day she believed the Plaintiff could spend sitting, standing and walking. As indicated above, Dr. Stone opined that Plaintiff could sit for three hours and stand and walk for one hour each per eight-hour workday. The form defined the terms "occasionally," "frequently," and "continuously'" to mean, respectively, 0% to 33%, 34% to 66%, and 67% to 100% of an eight-hour workday. Dr. Stone checked boxes to indicate her opinion that Plaintiff could occasionally lift and carry up to twenty pounds but could never lift or carry more than twenty; could use her hands frequently for fine manipulation but only occasionally for grasping, pushing, pulling, and reaching; could use her left but not her right foot to operate foot controls repetitively; and could occasionally bend, climb and reach above shoulder level, but could never squat, crawl or stoop. Dr. Stone also checked boxes to indicate Plaintiff was completely restricted from being around unprotected heights and driving equipment, and had moderate restrictions in being around moving machinery and

exposure to dust and fumes.   In the small space allotted for written comments, Dr. Stone noted that Plaintiff's restrictions were due to fibromyalgia, degenerative disease of the right knee (with a need for a replacement), and lumbar and cervical degenerative disc disease.   She also noted that Plaintiff would not be able to work eight hours a day, five days a week, and that she would require hourly breaks and the ability to lie down for at least thirty minutes twice a day.   (AR 3894.)

The ALJ did not reject Dr. Stone's opinion in its entirety.[5]   The ALJ expressly accepted some parts and rejected other portions of Dr. Stone's opinion, stating as follows:

> The objective findings from x-rays, MRIs and examination do not support the entirety of [Dr. Stone's] assessment, although portions of the opinion are supported by the medical evidence of record.   Furthermore, the relatively conservative and routine treatment the claimant has received does not support these severe limitations.   Additionally, none of the claimant's other doctors have placed any specific restrictions on her activities including the doctor at the pain management clinic.   While portions of the opinion are not supported, other parts of the opinion are well supported by the objective findings. Consequently, Dr. Stone's opinion is given some weight and portions of the opinion are incorporated into the residual functional capacity.

(AR 20.)   He concluded, based on Dr. Stone's opinion and other evidence in the record (including the evidence of Plaintiff's mental health) that Plaintiff could perform less than a full range of sedentary work, that she could lift up to twenty pounds occasionally; sit for six hours in an eight-hour workday; walk and stand for one hour each; occasionally bend, squat, crawl, climb, stoop and reach above shoulder level; use her hands frequently for grasping, pushing and pulling, fine manipulations and reaching; but that she could not use her right foot to operate foot controls or be around unprotected heights or driving equipment; and she had moderate restrictions in activities involving being around moving machinery and hazards and exposure to dust and fumes.   In sum, he rejected Dr. Stone's opinion limiting Plaintiff to sitting for no more than three hours per day, limiting her to "never" crawling, squatting or stooping, and to only occasionally (rather than frequently) grasping, pushing, pulling and reaching; and indicating she would need hourly breaks and the ability to lie down twice a day.   He also disregarded Dr. Stone's opinion that Plaintiff would be unable to work five days a week.

Social Security regulations require the agency to "give good reasons" for disregarding the medical opinion of a treating physician.   20 C.F.R. § 404.1527(d)(2).   Medical opinions are defined as opinions

---

[5]   The ALJ did appear, however, to completely disregard the medical record reviews and RFC assessments performed by Drs. Dillard and Allison in October 2007 and May 2008, respectively.

about the nature and severity of an individual's impairment(s), 20 C.F.R. §§ 404.1527(a), and they are the only opinions that may be entitled to controlling weight. S.S.R. 96-2p, 1996 WL 374188 at *2. Such opinions must be "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques and "not inconsistent" with the other "substantial evidence" in the individual's case record. *Id.* If the Secretary rejects the opinion of a treating physician, he must articulate a good reason for doing so. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

The problem with Dr. Stone's opinion is that it consists of a form with certain boxes checked, and the only support offered for the limitations ascribed by Dr. Stone is through referencing Plaintiff's diagnoses which, in and of themselves, are not determinative of whether the symptoms caused by those conditions are disabling under the Social Security regulations. Moreover, it is questionable whether a physician's opinion provided for purposes of litigation by means of checking boxes and filling in blanks on a form regarding a claimant's ability to do work-related activities constitutes a medical opinion entitled to substantial deference, particularly where, as here, the physician made essentially no attempt to support her opinions with reference to the medical record or her own treatment notes. Moreover, there is no evidence in the record that Dr. Stone ever discussed with Plaintiff or examined her with regard to her ability to perform work-related activities such as standing, walking, lifting and using her upper extremities for pushing and pulling. *Cf. Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (holding that the ALJ "permissibly rejected" three psychological evaluations "because they were check-off reports that did not contain any explanation of the bases of their conclusions"); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3rd Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."); *O'Leary v. Schweiker*, 710 F.2d 1334, 1341 (8th Cir. 1983) ("[W]hile these forms are admissible, they are entitled to little weight and do not constitute 'substantial evidence' on the record as a whole.").

Even if the form filled out by Dr. Stone could be considered "substantial evidence," the ALJ gave "good" reasons for rejecting it. He noted that in reaching his conclusion regarding Plaintiff's limitations, he had "considered all the symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p." (AR 17.) He also indicated he had "considered opinion

evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (AR 17.) In light of those parameters, he considered that some of the limitations ascribed by Dr. Stone were supported by the objective evidence in the record and others were not. He further noted, correctly, that none of Plaintiff's treating specialists—pain-management practitioners and neurologists—ascribed any such limitations to her.

Largely because the opinion of Dr. Stone itself does not qualify as substantial evidence, but also because the ALJ provided barely good enough reasons for rejecting it, the Court finds that the ALJ did not err in rejecting the opinion of Dr. Stone, Plaintiff's treating general practitioner.

## V.     CONCLUSION

Plaintiff's case is frankly a troubling one. There is substantial evidence in the record indicating that Plaintiff, at the time of the hearing, was in significant pain that was not well controlled by medication or other conservative treatment, and that she likely was having difficulty functioning on a day-to-day basis. Unfortunately, however, the Administrative Record is completely devoid of any residual functional capacity assessments from her pain-management or neurological specialists. The medical record also appears to be incomplete, as there are references to the diagnosis of fibromyalgia, to the ruling out of lupus, to physical therapy in 2006, and to knee surgery in the spring of 2007 the records for which are not contained within the Administrative Record. In light of the evidence that is in the record, the Court concludes that the ALJ's decision to reject Plaintiff's subjective claims of disabling pain is barely supported by the record, and his decision to reject the more restrictive aspects of Dr. Stone's opinion is justified because the form filled out by Dr. Stone does not qualify as "substantial evidence" of Plaintiff's inability to perform work-related activities. For these reasons, the Court finds that the decision to deny benefits is supported by substantial evidence in the record. Plaintiff's motion for judgment will therefore be denied and the Commissioner's decision affirmed.

An appropriate Order will enter.

_____
Thomas A. Wiseman, Jr.
Senior U.S. District Judge